OPINION
{¶ 1} The plaintiff-appellant, the State of Ohio, appeals the judgment of the Mercer County Court of Common Pleas granting the defendant-appellee, James W. Geeslin's, motion to dismiss.
 {¶ 2} In the early morning of August 16, 2004, Ohio State Highway Trooper Tim Wenger allegedly observed a 1992 Dodge minivan driving over the white edge line on the road on three different occasions. Accordingly, Wenger initiated a traffic stop and found Geeslin to be the driver.
 {¶ 3} Wenger allegedly observed an odor of alcohol. Furthermore, Wenger noticed that Geeslin allegedly had blood shot eyes and was unsteady on his feet. Wenger requested that Geeslin perform some field sobriety tests, and Geeslin complied. In Wenger's opinion, Geeslin performed poorly on the field tests. Subsequently, Geeslin was arrested, and within two hours, he consented to a BAC test, which results showed that Geeslin had 0.176 grams of alcohol per 210 liters of breath.
 {¶ 4} The patrol car that Wenger used the night of Geeslin's arrest was equipped with a video recording system, and Wenger used this equipment to record Geeslin's entire traffic stop beginning with the alleged driving over the white line until the arrest. In fact, once Geeslin was arrested and taken to the police station, Wenger removed the videotape from his patrol car and reviewed it for accuracy while filling out his report. Because Wenger was not assigned to a specific patrol car, he kept possession of the tape until he arrived at work the next morning. When Wenger set out to patrol in a different cruiser, he placed the tape back into the video recording system. Later that day, he used the recording system to assist in effectuating another traffic stop.
 {¶ 5} Wenger soon discovered that a portion of Geeslin's traffic stop was recorded over by the traffic stop that Wenger made the day after Geeslin's arrest. Specifically, the portion of Geeslin's stop that was missing was the alleged driving over the white line three times. Wenger noted that the "tape over" was due to his misunderstanding that when he turned on the tape to record another traffic stop, the video recording system would automatically fast-forward the tape to a blank spot before recording. However, the automatic fast-forward only works when the tape is not removed from the video recording system. Thus, since Wenger removed the tape to review Geeslin's traffic stop the night of Geeslin's arrest and placed the tape back into the machine the next day, the automatic fast-forward feature was not functional, so Geeslin's alleged erratic driving was not recorded.
 {¶ 6} Geeslin was indicted for two counts of operating a motor vehicle while intoxicated in violation of R.C.4511.19(A)(1); (G)(1)(d) and 4511.19(A)(8);(G)(1)(d). On November 29, 2004, Geeslin filed a motion to dismiss alleging that the State destroyed potentially exculpatory evidence. The trial court agreed and dismissed the charges. It is from this judgment that the State of Ohio appeals alleging one assignment of error.
A FAILURE TO PRESERVE POTENTIALLY USEFUL, BUT NOT MATERIALLYEXCULPATORY EVIDENCE, VIOLATES A DEFENDANT'S DUE PROCESS RIGHTS,ONLY IF THE POLICE OR THE PROSECUTION HAVE ACTED IN BAD FAITH.
 {¶ 7} Initially, we note that we apply de novo review to a trial court's grant of a motion to dismiss on the ground that the State's failure to preserve exculpatory evidence violated a criminal defendant's due process rights. State v. Combs, 5th Dist. No. 03CA-C-12-073, 2004-Ohio-6574 at ¶ 25 (citing UnitedStates v. Wright, (6th Cir. 2001), 260 F.3d 568, 570); State v.Johnson, 8th Dist. No. 82527, 2003-Ohio-4569 at ¶ 7; see alsoState v. Benton (2000), 136 Ohio App.3d 801, 805.
 {¶ 8} In this appeal, we are asked to analyze an area of law that "might loosely be called the area of constitutionally guaranteed access to evidence." United States v.Valenzuel-Bernal (1982), 458 U.S. 858. In this area, United States Supreme Court precedent makes clear that a defendant has a constitutional right under the Due Process Clause of the Fourteenth Amendment to request and obtain from the state evidence that is either material to the defendant's guilt or relevant to the punishment to be imposed. Brady v. Maryland
(1963), 373 U.S. 83, 87, 83 S.Ct. 1194. Additionally, even in the absence of a specific request by the defendant, due process further requires the state to turn over exculpatory evidence that would raise reasonable doubt about the defendant's guilt. UnitedStates v. Agurs (1976), 427 U.S. 97, 112, 96 S.Ct. 2392. Today, we are asked to consider whether these precedents require a trial court to dismiss charges against a defendant when it learns that the state has destroyed evidence that may exculpate the defendant.
 {¶ 9} The Supreme Court of Ohio has not specifically addressed the issue of whether a police erasure of a DUI arrest videotape prior to trial violates the defendant's due process rights. However, several Ohio appellate courts have squarely addressed this issue. See State v. Durnwald, 6th Dist. No. S-04-013, 2005-Ohio-4867; State v. Combs, 5th Dist. No. 03CA-C-12-073, 2004-Ohio-6574; State v. Benson,152 Ohio App.3d 495, 2003-Ohio-1944; State v. Fuller, 2nd Dist. No. 18994, 2002-Ohio-2055; State v. Benton (2000), 136 Ohio App.3d 801. For the reasons that follow, we disagree with the analysis applied by the other Ohio appellate districts.
 {¶ 10} As the other courts have recognized, the Due Process Clause protects criminal defendants in two ways when it comes to the government's handling of exculpatory evidence in its possession. First, there is a due process violation if the state fails to preserve "materially exculpatory" evidence, regardless of the culpability of the government actors. Brady v. Maryland
(1963), 373 U.S. 83, 87 ("[T]he suppression of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); California v. Trombetta (1984), 467 U.S. 479,489-90. Second, if the state destroys evidence that is "potentially useful," there is only a due process violation if the government acted in bad faith. Arizona v. Youngblood
(1988), 488 U.S. 51, 58. The Ohio courts addressing this issue have analyzed these as alternative tests, either (1) allowing the defendant to prove that the evidence was materially exculpatory, or (2) allowing the defendant to show the evidence was potentially useful and then establish bad faith by the government.[1] However, pursuant to the Supreme Court's holding Youngblood, we find that these two tests are mutually exclusive; only one test will be applicable in each case, and the determination of which test to apply is based solely on the type of evidence involved.
 {¶ 11} Our finding that the Brady and Youngblood tests are mutually exclusive is predicated on the Court's analysis inYoungblood. Youngblood established a separate analysis under the Due Process Clause for evidence Chief Justice Rehnquist termed "potentially useful." Youngblood, 488 U.S. at 58. In doing so, Chief Justice Rehnquist, writing for the majority, specifically distinguished the type of evidence at issue in that case from "materially exculpatory" evidence that was involved inBrady and its progeny:
The Due Process Clause of the Fourteenth Amendment, asinterpreted in Brady, makes the good or bad faith of theState irrelevant when the State fails to disclose to thedefendant material exculpatory evidence. But we think the DueProcess Clause requires a different result when we deal with thefailure of the State to preserve evidentiary material of whichno more can be said than that it could have been subjected totests, the results of which might have exonerated the defendant.
Id. (emphasis added). Thus, Youngblood created a separate test for evidence that would not exonerate the defendant in and of itself but which was testable, where the results of those tests could have been exculpatory. The Court went on to hold that the failure to preserve this "potentially useful" evidence is a due process violation only when the criminal defendant "can show bad faith on the part of the police." Id.
 {¶ 12} The evidence at issue in Youngblood and inTrombetta, Youngblood's predecessor, illustrates this distinction. In Trombetta, a group of defendants filed motions to suppress breath test results on the ground that the arresting officers failed to preserve samples of the defendant's breath. Id. at 482. As the Court noted, "[t]he evidence to be presented at trial was not the breath itself but rather the Intoxilyzer results obtained from the breath samples." Id. at 479. The Court concluded that such evidence could not be considered "material." Id. at 489. Indeed, the Court presented the issue in Trombetta
as "whether the Fourteenth Amendment also demands that the State preserve potentially exculpatory evidence on behalf of defendants." Id. at 481 (emphasis added). Because the evidence was not "material" it was not protected under Brady, and the Court found no due process violation. Id. at 491.
 {¶ 13} The evidence at issue in Youngblood was the clothing of a young boy whom the state alleged was sodomized by the defendant. The police failed to refrigerate the clothing, and as a result the DNA material on the clothing was not properly preserved. Youngblood, 488 U.S. at 52-53. Tests ran on the semen came back inconclusive as to the man's identity, but Youngblood was charged. Id. At trial, expert witnesses testified that Youngblood might have been completely exonerated by timely performance of tests on properly preserved semen samples. Id. at 54. The evidence that was not preserved, like the evidence destroyed in Trombetta, was not the evidence that would have exculpated the defendant; the fact that there was semen on the clothes would do nothing to prove Youngblood's innocence. The results of DNA tests performed on the clothing, however, may have exonerated him by establishing the identity of the boy's molester. The Court concluded that there was no due process violation stemming from the failure to preserve this evidence,because there was no bad faith on the part of the prosecution. Id. at 58.
 {¶ 14} The Court's analysis in Youngblood therefore expanded on the holding in Trombetta that Brady did not apply to evidence that was not material. In doing so, Youngblood
created a second level of due process protection for evidence that was not exculpatory in and of itself, but could lead to exculpatory evidence through testing. Youngblood,488 U.S. at 57-58. It is only in these cases that the good or bad faith of the prosecution is at issue. Id.
 {¶ 15} Part of the rationale for the difference in treatment is the government's knowledge of the evidence's value to the defendant. Due process protection is meant to provide defendants with a prosecution that comports with fundamental fairness.Trombetta, 467 U.S. at 485. Thus, it protects a defendant from having evidence that is known to be of value to him destroyed by the police. As the Court recognized, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." Id. at 488-489. The Court was unwilling to impose "an undifferentiated and absolute duty [on the police] to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Youngblood, 488 U.S. at 58. The extra requirement of showing bad faith is necessary for "potentially useful" evidence, because the exculpatory value of that evidence is not apparent. In those instances, a showing of bad faith demonstrates that "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." Id. Thus, the requirement of demonstrating bad faith is the Court's means of having the defendant demonstrate the exculpatory value of evidence that is merely "potentially useful." On the other hand, the importance of materially exculpable evidence is readily apparent, and for that reason there is no additional requirement of showing bad faith.
 {¶ 16} Therefore, our first task is to ascertain the type of evidence that is at issue in this case, and determine whether it fits into the category of exculpatory evidence or whether it can only be considered "potentially useful" evidence. We find that the evidence in the instant case is not of the type that is considered "potentially useful" as defined in Youngblood. The videotape of the DUI arrest is not something that "could have been subjected to tests, the results of which might have exonerated the defendant." Id. at 57. It is the tape itself, or rather, what the tape shows, that would have either exculpated or inculpated Geeslin. There are no tests or procedures to be performed on the videotape that would have led to other evidence that may be exculpatory; the tape itself was either exculpatory or it was not. Accordingly, the analysis used by the Supreme Court in Youngblood for "potentially useful" evidence is inapplicable. We therefore limit our analysis to a determination of whether the videotape evidence was materially exculpatory.
 {¶ 17} Once we have determined the nature of the evidence at issue, our next task is to determine whether the evidence is "materially exculpatory." As all of the Ohio appellate courts have recognized, the burden of proving that the destroyed evidence was materially exculpatory is ordinarily on the defendant. Trombetta, 467 U.S. at 489-90; State v. Jackson
(1991), 57 Ohio St.3d 29, 33. However, some appellate courts have shifted the burden to the State after "the state breaches its duty to respond in good faith to a defense request to preserve evidence." State v. Forest (1987), 36 Ohio App.3d 169, 173; see also Benton, supra at 805-06; Benson, supra at ¶ 11. Indeed, we recognized Forest and shifted the burden onto the state in our decision in State v. Cahill, Shelby App. No. 17-011-9, 2002-Ohio-4459, at ¶¶ 14 and 17. The Forest rule parallels the Supreme Court's reasoning in Trombetta and Youngblood: if the defendant demonstrates that the government destroyed the evidence after a request to preserve evidence, it is reasonable to conclude that the police, by their very conduct, consider the evidence to be potentially helpful to the defense. Put another way, by proving that the police responded in bad faith to a discovery request by destroying the evidence, the defendant has, to some extent, established the exculpatory value of the evidence. We see nothing wrong in thereafter placing the onus on the State to demonstrate that the evidence is not exculpable.
 {¶ 18} However, in the instant case the burden must remain on the defendant because the evidence was destroyed prior to the initiation of these proceedings.[2] The Forest rule only shifts the burden onto the State after a specific discovery request has been made, because that request put the State on notice that the defendant may have considered the evidence relevant to his defense. The Tenth District therefore has limitedForest, and found it inapplicable to situations where there is no indication that the defendant requested the evidence. Statev. Groce (1991), 72 Ohio App.3d 399, 402, 594 N.E.2d 997.
 {¶ 19} In sum, we agree with the other appellate courts interpreting Forest who have found that there is no bad faith when evidence is destroyed prior to a request to preserve evidence. Fuller, supra at *3; State v. Tarleton, 7th Dist. No. 02-HA541, 2003-Ohio-3492, at ¶ 26. Accordingly, in the instant case the burden does not shift to the State because Geeslin has not shown that the State failed to respond in good faith to a discovery request. Rather, the record indicates that Geeslin's attorney was told immediately upon asking for the videotape that a portion of the tape had been erased. Moreover, the trial court made a specific finding that the State had not acted in bad faith. Thus, the burden remains on Geeslin to demonstrate that the government destroyed materially exculpatory evidence.
 {¶ 20} In order for evidence to be materially exculpatory, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Trombetta,467 U.S. at 489. The Supreme Court of Ohio has also held that evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." State v. Johnston, 39 Ohio St.3d 48, ¶ 5 of the syllabus.
 {¶ 21} In the instant case, the sole evidence Geeslin put forth about what the tape would have shown was his assertion that he did not cross over the white line. This assertion, standing alone, is insufficient to fulfill his burden, as it does no more than counter Trooper Wenger's testimony that he observed Geeslin cross over the white line three times. Our conclusion might be different if Geeslin had presented any independent evidence demonstrating that he did not cross the white line — a corroborative witness, photographs of the pavement showing no tire marks, etc. However, his mere assertion that he did not cross the line is insufficient to fulfill his burden of showing that the videotape contained an apparent exculpatory evidence.
 {¶ 22} Furthermore, the nature of the evidence in question provides no basis for undermining confidence in whatever the outcome of this case is. What the trier of fact would be left to consider, without this portion of the videotape, is the testimony of Trooper Wenger and of the defendant. The fact-finder would be free to gauge the credibility of these witnesses, and the trooper would be subject to cross examination on the issue of the erased videotape, an issue which will surely be damaging to the credibility of his testimony. Finally, the factfinder will be able to examine the rest of the videotape and judge for himself which testimony is more credible in light of Geeslin's demeanor, physical state, and performance in the field sobriety tests. Ultimately, it seems reasonable to conclude that the trier of fact can make a fair and just determination of guilt in this proceeding without this portion of the videotape, and thus we cannot say that there is a reasonable probability that the result of the proceeding would have been different.
 {¶ 23} Accordingly, in accordance with this analysis and the United States Supreme Court's holdings in Brady, Trombetta, andYoungblood, we find that Geeslin's due process rights have not been violated. Based on the foregoing, the state's assignment of error is well taken, and the judgment of the Mercer County Court of Common Pleas is reversed.
Judgment Reversed and Cause Remanded.
 Bryant, J. concurs.
[1] For instance, in Combs, supra at ¶ 25 the Fifth District held that "the video tape was not materially exculpatory but, rather, was potentially useful." In Benson, supra at ¶ 12-13, the court concluded that "[d]espite the state's arguments, it is possible that the tape was materially exculpatory. * * * [But] even if we were to determine that the evidence was only potentially useful, we cannot escape the question of whether the state acted in good faith." Likewise, in both Durnwald andFuller the court concluded that the defendant failed to prove that the evidence was materially exculpatory, but held that the evidence was potentially useful. Durnwald, supra at ¶ 31;Fuller, supra at *3.
[2] To be clear, bad faith in this context is not a matterhow the police destroyed evidence, it is only a question ofwhen. When examining bad faith in cases dealing with "potentially useful" evidence, a demonstration that the police failed to follow their own procedures may be sufficient to show they acted in bad faith. When determining who has the burden of proving whether evidence is materially exculpatory, the only way of proving bad faith is establishing that the evidence was destroyed after a specific request by the defendant to preserve the evidence in question.